# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 2685 | **DATE** | 7/8/2004 |
| **CASE TITLE** | USA vs. Andrew Traeger | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. In sum, "it appears that an evidentiary hearing is not required" (Rule 8(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts), so that the same rule calls for this Court to "make such disposition of the motion as justice dictates." That justice-dictated disposition is the denial of Traeger's entire Section 2255 motion, and this Court so orders.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUL 0 9 2004 | 10 |
| | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 7/8/2004 | |
| SN | courtroom deputy's initials | 2004 JUL -8 PM 4:01 | date mailed notice SN | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
)
          Plaintiff, )
)
v. ) No. 04 C 2685
) (97 CR 697)
ANDREW TRAEGER, )
)
          Defendant. )

DOCKETED JUL 09 2004

MEMORANDUM OPINION AND ORDER

This Court initially (and promptly) conducted the required preliminary review of the self-prepared 28 U.S.C. §2255 ("Section 2255") motion by which Andrew Traeger ("Traeger") has recently sought to attack his March 1999 conviction on charges of bank robbery and attempted bank robbery, pursuant to which he is serving a 210-month sentence (imposed some two years later) that he also challenges. This Court just as promptly issued its April 16, 2004 memorandum order that (1) summarily dismissed Traeger's "Ground One" but (2) required the United States to file an answer or other pleading to the balance of Traeger's motion on or before May 28. That in turn triggered a government motion to obtain Traeger's medical information and records, something that Traeger himself had requested in his letter received by this Court on March 18, 2004 ("March 18 Letter," a copy of which is attached as Ex. 1), in which letter he had asked permission to file his belated Section 2255 motion that he tendered a month later.

After this Court granted the government's motion, the Assistant United States Attorney handling the case proceeded to get the requested information, and on June 30 the government filed its written response to Traeger's Section 2255 motion. On that same day (by sheer coincidence) this Court also received Traeger's handwritten amendment to his motion in which--like countless other criminal defendants--he seeks to invoke the Supreme Court's recent decision in <u>Blakely v. Washington</u>, 72 U.S. Law Week 4546 (U.S. June 24, 2004) as providing another asserted basis for Section 2255 relief.

It should be made plain at the outset that the normal operation of Section 2255's one-year limitation period would bar Traeger's motion, with the possible exception of his newest <u>Blakely</u>-based contention (of which more later). As for the one-year period as such, once Traeger's direct appeal resulted in the affirmance of his conviction and sentence on May 8, 2002 (see 289 F.3d 461 (7th Cir. 2002)) he sought certiorari review but was turned down by the Supreme Court on November 12, 2002 (<u>Traeger v. United States</u>, 537 U.S. 1020 (2002)). Hence his April 2004 Section 2255 filing was some five months out of time on its face (or even if he were instead to be credited with the date of the March 18 Letter as equivalent to a Section 2255 filing, he still would have been some four months out of time).

Because today's ruling is based on the untimeliness of

2

Traeger's motion (a holding that, as will be seen, flatly rejects his equitable tolling argument discussed hereafter), this Court need not take the time and effort to address his several substantive grounds for relief. There is one noteworthy exception: "Ground Three," which occupies nine closely handwritten pages that form part of the motion, charges five instances of what Traeger characterizes as the constitutionally inadequate representation by his trial counsel Ronald Clarke ("Clarke"). But several other claimed inadequacies on Clarke's part had formed a major part of Traeger's direct appeal and were rejected by the Seventh Circuit (see 289 F.3d at 470-73). And that being so, <u>United States v. Cooke</u>, 110 F.3d 1288, 1299 (7th Cir. 1997)(citations omitted and emphasis added) explains the impermissibility of Traeger's current effort to attack Clarke's performance for a second time:

> This Court's reluctance to consider ineffective assistance claims on direct appeal stems, of course, from the fact that such claims are very unlikely to find any factual support in the trial record and <u>an adverse determination on direct appeal will be res judicata in any subsequent collateral attack</u>. As we have so often put it, "a defendant who presents an ineffective-assistance claim for the first time on direct appeal has little to gain and everything to lose."

In short, that aspect of the motion is barred by claim preclusion.

Now to the belatedness of the current motion. Except for the new <u>Blakely</u> issue, which will be dealt with at the end of

3

this opinion, Traeger seeks to invoke the doctrine of equitable tolling to escape that limitations bar--and he does so in attempted reliance on the matters that he has set out in the March 18 Letter. But the government has responded to Traeger's generalized and conclusory self-evaluation contained in that letter in dispositive fashion: Ex. 2 to this opinion is the affidavit of Dr. Thomas Hare that details (1) Traeger's treatment at the Springfield, Missouri Medical Center by Dr. Hare and his predecessors as well as (2) Traeger's conduct that gives the lie to his assertion of inability to prepare and submit a Section 2255 motion long before he did so here. Nothing in Dr. Hare's continuous personal observation of Traeger (informed of course by Dr. Hare's extensive professional experience), and nothing in the medical records that antedated Dr. Hare's arrival, provide even a smidgen of confirmation of Traeger's unsupported contention as to his inability to proceed with a Section 2255 motion in timely fashion--just the opposite is true.[1]

Our Court of Appeals has consistently taken an extremely dim view of efforts such as Traeger's, so much so that Nolan v.

---

[1] One of Oscar Wilde's famous aphorisms is this one from Act III of Lady Windermere's Fan:

> In this world there are only two tragedies. One is not getting what one wants, and the other is getting it.

In this instance Traeger has gotten what he said he wanted in his March 18 Letter, and that information has only succeeded in confirming the invalidity of his equitable tolling claim.

4

United States, 358 F.3d 480, 484 (7th Cir. 2004) has put the matter in these terms:

> Equitable tolling is a remedy reserved for "[e]xtraordinary circumstances far beyond the litigant's control [that]...prevented timely filing." Modrowski [v. Mote], 322 F.3d [965,] 967 [(7th Cir. 2003)](quoting [United States v.] Marcello, 212 F.3d [1005,] 1010 [(7th Cir. 2000)]). Equitable tolling of the statute of limitations is such exceptional relief that "we have yet to identify a circumstance that justifies equitable tolling in the collateral relief context." Id. (citing Lloyd v. VanNatta, 296 F.3d 630, 633 (7th Cir. 2002)).

In a different context but to identical effect, Miller v. Runyon, 77 F.3d 189, 191 (7th Cir. 1996) has taught that the tolling of limitations because of claimed mental difficulties exists "only if the illness in fact prevents the sufferer from managing his affairs and thus from understanding his legal rights and acting upon them."

Throughout the original underlying proceedings before this Court, Traeger proved himself to be highly manipulative and lacking in credibility. Those same traits, which he exhibited both before and after his trial, were in part exemplified and in part suggested by the matters set out in the opinion issued by the Court of Appeals on direct appeal. And his lifelong career of crime further supports the absence of credibility that calls for the rejection of his current claims.

In that respect Traeger's Presentence Investigation Report before this Court reflected, despite the fact that no fewer than

5

five of his criminal convictions beginning at age 17 were too old to have been counted for criminal history points under the Sentencing Guidelines, that he managed to amass 18 criminal history points as an adult--placing him in Criminal History Category VI, the top of the line (just 13 points would have been enough to put him in Category VI). And because two of Traeger's prior convictions, as well as the bank robbery of which he was convicted before this Court, were crimes of violence, he was a "career offender" within the meaning of Guideline §4B1.1, driving his Guideline range up to 210-62 months.[2] Indeed, perhaps nothing better demonstrates Traeger's career criminal mindset and predilections than the fact that he robbed the LaSalle Bank (which caused his conviction in this case) just one month after he had been released from serving a prison term for having robbed the same bank--in the first case with his having given a note to the teller containing a death threat of a bomb, and in the second case with his having given the teller an oral death threat:

> I have a gun. Don't push the button. If you push the button, I'm going to kill you.

Under the circumstances no useful purpose would be served, and no difference in result would be occasioned, by an

---

[2] Apart from those crimes of violence, the other federal crime on which he was serving a concurrent sentence with his earlier bank robbery had involved the unlawful possession of credit cards stolen from the United States mail and then used unlawfully by Traeger--a crime directly involving dishonesty.

evidentiary hearing on the current Section 2255 motion. Even if Traeger were to convert his unsworn statement in the March 18 Letter to testimony under oath, this Court would not credit it against Dr. Hare's affidavit, which the government has obtained and proffered both for its own purposes and in response to Traeger's having requested that his medical history be provided to this Court. There is thus no way in which Traeger's self-serving claim of having been unable to proceed with a timely motion could support an equitable estoppel claim.

That then dispatches all aspects of Traeger's motion save one: the newest ground he seeks to advance--an attempted challenge to his sentence based on the recently decided <u>Blakely</u> case. That recently added challenge looks not to notions of equitable tolling, but rather to a claimed restarting of the Section 2255 limitations clock on the date that <u>Blakely</u> was decided. To that end Traeger must rely on that date qualifying under this alternative subdivision of Section 2255:

> the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review.

Just to quote that provision, however, is to confirm its inapplicability. <u>Blakely</u> itself did not announce that it was applicable retroactively--and indeed the same-day decision in <u>Schriro v. Summerlin</u>, 72 U.S.L.W. 4561 (U.S. June 24, 2004) teaches the strong unlikelihood that <u>Blakely</u> will hereafter be

7

given retroactive effect.

In sum, "it appears that an evidentiary hearing is not required" (Rule 8(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts), so that the same rule calls for this Court to "make such disposition of the motion as justice dictates." That justice-dictated disposition is the denial of Traeger's entire Section 2255 motion, and this Court so orders.

                                             Milton I. Shadur
                                             Senior United States District Judge

Date:  July 8, 2004

UNITED STATES DISTRICT COURT    FILED

NORTHERN DISTRICT OF ILLINOIS    MAR 1 8 2004

EASTERN DIVISION    MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA    DOCKETED   CAUSE NO. 97 CR 697

VS.    MAR 2 2 2004

ANDREW TRAEGER    HONORABLE MILTON I. SHADUR

NOW COMES THIS DEFENDANT, ANDREW TRAEGER, WHOM REQUESTS PERMISSION TO FILE HIS 2255, 5 MTS LATE. THE REASON FOR THIS MOTION AND THIS REQUEST, IS DUE TO THE ISSUE OF THE ONE YEAR TIME LIMIT. OUR SUPREME COURT DENIED CERTIORARI, NOV. OF 2002, AT THIS TIME THE ONE YEAR TIME LIMIT BEGAN. PRIOR TO THAT DATE (MARCH 6, 2002), THIS DEFENDANT WAS PLACED AND CONFINED AT A MEDICAL CENTER AT SPRINGFIELD MO., DUE TO KIDNEY STONES. 4 OPERATIONS WERE PREFORMED TO BLOW UP THESE LARGE STONES IN BOTH KIDNEY'S. DURING THIS PERIOD, MARCH 6TH, 2002 AND LATE FEB. 2004 I WAS ON HIGH DOSES OF MORPHINE, 60 mg EVERY 4 HRS, ALONG WITH OTHER DRUGS. THEN I WAS FORCED TO DETOX. DURING THIS TIME, I COULD OF NEVER INTROPUCED, ENTERTAINED OR PROCEEDED WITH ANY FORM OF LEGAL ISSUES TO THIS HONORABLE COURT. MY MENTAL STATUS WAS NOT NORMAL. I RETURNED TO MY PARENT INSTITUTION ONLY 2 WEEKS AGO, TODAYS DATE 3-14-04

THIS DEFENDANT HUMBLY REQUESTS THAT THIS HONORABLE COURT REQUEST MY MEDICAL FILES FROM SPRINGFIELD MO., WHICH WILL IN FACT SUPPORT MY POSITION, AND ON COMPLETION OF REVIEW, ALLOW THIS DEFENDANT A SET TIME TO FILE HIS 2255 WITH THIS HONORABLE COURT.

I, ANDREW TRAEGER DO HEREBY DECLARE UNDER THE PENALTY OF PERJURY THAT THIS IS TRUE AND CORRECT.    ANDREW TRAEGER
Andrew Traeger

EXHIBIT 1

# **AFFIDAVIT**

I, Dr. Thomas Hare, state as follows:

1. I am a licensed physician and am Board Certified in Family Practice since 1989. I have been employed by the Bureau of Prisons since 1996 at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP") as a staff physician. While at MCFP, I have worked in the Neurology Deptartment, the Surgical Deptartment, the Oncology Deptartment, Orthopedics, and the Outpatient Unit. I am presently in charge of the Internal Medicine Department.

2. When a prisoner initially arrives at MCFP, the prisoner is seen by a staff physician to review the prisoner's physical history, evaluate the prisoner's physical condition and determine future medical procedures that need to be performed and determine whether the prisoner needs to be seen by a specialist. Prisoners are typically seen by a staff physician every four weeks while at MCFP. Prisoners may also make written requests to the staff physicians in between appointments. While at MCFP, most prisoners are assigned to a hospital bed with access to an exercise equipment and a law library. Because my office is in the same building where some of the prisoners are housed, I often see and talk with prisoners in the halls between scheduled appointments.

3. Andrew Traeger was admitted to MCFP on March 7, 2002 because of recurrent kidney stones. Mr. Traeger was initially

1

EXHIBIT 2

treated by Dr. Corry who was one of the staff physicians at MCFP. After Dr. Corry left MCFP, Mr. Traeger was assigned to Dr. Pearson and then, subsequently myself. I assumed his care in or about August, 2003 until his discharge in the Spring of 2004. In addition to treating Mr. Traeger, myself, I have also reviewed his medical records from MCFP. This affidavit does not include every detail of Mr. Traeger's medical treatment while at MCFP, rather it addresses Mr. Traeger's general mental and physical condition during his treatment at MCFP.

4. While at MCFP, Mr. Traeger was treated by two visiting specialists in Urology, Dr. Johnson and Dr. Walterskirchen. In order to treat Mr. Traeger's recurring kidney stones while at MCFP several procedures were performed including a stent that was placed in his ureter when he developed a partial obstruction of the drainage of his right kidney. Mr. Traeger had multiple cystoscopic stone removals and lithotripsy (another treatment to eliminate a kidney stone) and stent placement and removal. Secondarily, Mr. Traeger was treated on one occasion for the inflamation of a blood vessel in his leg and otherwise Mr. Traeger received continued routine care for his high blood pressure, gout, and arthritis.

5. While at MCFP, Mr. Traeger received several blood pressure medications (a potassium pill was also administered to counter-balance the blood pressure medication), a cholesterol medication, medication for gout, and ibuprofen. None of these medications

caused Mr. Traeger any physical or mental incapacitation.

6. For the majority of the time Mr. Traeger was at MCFP, he was prescribed pain killers. When I began treating Mr. Traeger, he was being administered 240mg of sustained release morphine (60mg every 4 hours). I continued this dosage for the time I treated Mr. Traeger until he began to be weaned off the morphine in or about January 2004. Although this is an unusually large amount of morphine, a person's tolerance for such a pain killer may vary depending upon the person's weight and size, any prior drug use, and the continued use of the medication.

7. During my treatment of Mr. Traeger, I saw Mr. Traeger on approximately 10 separate occasions for scheduled office visits. During this time period, I also saw and talked to Mr. Traeger numerous times in the halls of our facility since Mr. Traeger was housed in the same building as my office. On every occasion that I visited Mr. Traeger or evaluated him medically, he was lucid, coherent, alert and communicated in an organized rational manner. During my treatment of Mr. Traeger, I witnessed no mental or physical limitation by Mr. Traeger. Mr. Traeger's speech was never slurred, he was always alert, courteous and even friendly. The primary interaction I had with Mr. Traeger was always the same, "I need more morphine or please don't decrease my morphine." In addition, there is no indication in the file that Mr. Traeger suffered any mental impairment prior to my treatment of him. I am

3

also aware that Mr. Traeger worked as an orderly while at MCFP.

8. Mr. Traeger was discharged from MCFP in or about March 2004. At the time of discharge, Mr. Traeger had recovered well, although he could have future problems and recurring kidney stones.

9. Although Mr. Traeger's discharge summary was written up on December 12, 2003, Mr. Traeger remained at MCFP for several months in order for him to adjust to the reduction of pain killers. Mr. Traeger began to be weaned from the morphine in January 2004. Mr. Traeger was prescribed Percocet to replace the morphine and help him withdraw from pain killers. There is no indication in the file I have reviewed that this withdrawal interfered in any way with the routine activity of Mr. Traeger's daily living.

Thomas Hare, D.O.
Medical Officer,
U.S. Medical Center
for Federal Prisoners

SUBSCRIBED and SWORN to before me this
22 day of June, 2004

NOTARY PUBLIC

ELIZABETH ROHACH
NOTARY PUBLIC, STATE OF MISSOURI
GREENE COUNTY
MY COMMISSION EXP. SEPT 6, 2005

4